Slip Op. 21-44

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **QINGDAO SEA-LINE INTERNATIONAL TRADING CO., LTD.,**<br><br>            **Plaintiff,**<br><br>    v.<br><br>**UNITED STATES,**<br>                **Defendant,**<br>    **and**<br><br>**FRESH GARLIC PRODUCERS ASSOCIATION, AND ITS INDIVIDUAL MEMBERS CHRISTOPHER RANCH, L.L.C., THE GARLIC COMPANY, AND VALLEY GARLIC,**<br><br>            **Defendant-Intervenors.** | **Before: Gary S. Katzmann, Judge**<br>**Court No. 19-00145**<br><br>*PUBLIC VERSION* |

## OPINION

[The court denies Plaintiff's motion for judgment on the agency record and sustains Commerce's Final Results.]

Dated: <u>April 16, 2021</u>

<u>Irene H. Chen</u>, Chen Law Group LLC, of Rockville, MD, argued for plaintiff.

<u>Meen Geu Oh</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Reginald Blades, Jr.</u>, Assistant Director. Of Counsel <u>Brendan Saslow</u>, Attorney, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce. With them on the post argument submission was <u>Jeffrey Bossert Clark</u>, Acting Assistant Attorney General.

<u>Joshua R. Morey</u>, Kelley Drye & Warren LLP, of Washington, DC, argued for defendant-intervenors. With him on the brief was <u>Michael J. Coursey</u> and <u>John M. Herrmann</u>.

        Katzmann, Judge: This case concerns the reliance on facts otherwise available ("FA") and

application of an adverse inference ("AFA") in an antidumping ("AD") review by the U.S.

Department of Commerce ("Commerce"), resulting in a higher tariff, where respondent submitted inconsistent and unreliable information regarding its U.S. sales price.  At issue is Commerce's twenty-third administrative review of AD duties on fresh garlic from China.  <u>Fresh Garlic from the People's Republic of China: Final Results of the 23rd Antidumping Duty Administrative Review; 2016–2017</u>, 84 Fed. Reg. 35,601 (Dep't Commerce July 24, 2019) ("<u>Final Results</u>"); Issues and Decision Mem. for the Final Results of the AD Duty Administrative Review: Fresh Garlic from the People's Republic of China; 2016–2017 (July 19, 2019), P.R. 282 ("IDM"); Final Analysis Mem. for Qingdao Sea-Line Int'l Trading Co., Ltd. (July 25, 2019), P.R. 284, C.R. 159 ("Final Analysis Memo").  Plaintiff Qingdao Sea-Line International Trading Co., Ltd. ("Sea-Line"), an exporter of fresh garlic from China, brought this suit against Defendant the United States ("Government") to challenge the <u>Final Results</u>, specifically Commerce's application of AFA to its own dumping margin and, assuming that AFA was incorrectly applied, Commerce's selection of a surrogate country in its calculation of a dumping margin for all other respondents to Commerce's review.  <u>See</u> Mem. in Supp. of Pl.'s Rule 56.2 Mot. for Summ. J. at 1, Feb. 18, 2020, ECF No. 26 ("Pl.'s Br.").  The Government and Defendant-Intervenor Fresh Garlic Producers Association, including its individual members Christopher Ranch L.L.C., The Garlic Company, and Valley Garlic, (collectively, "FGPA"), ask the court to sustain Commerce's determination.  Def.'s Resp. to Pl.'s Mot. for J. Upon the Agency R., May 8, 2020, ECF No. 29 ("Def.'s Br."); Def.-Inters.' Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R., May 27, 2020, ECF No. 30 ("Def.-Inter.'s Br.").[1]  The court sustains Commerce's <u>Final Results</u> as to Sea-Line and denies Sea-Line's motion.

---

[1] Many citations are to confidential filings for clarity in explaining the timeline of events.  Public versions, often filed at later dates, are available on the public docket with corresponding pagination.

## BACKGROUND

### I.     *Legal Framework*

Congress's AD statute empowers Commerce to impose remedial duties on imported goods when those goods are sold in the United States for less than their fair market value, and when the International Trade Commission determines that the domestic industry is thereby "materially injured, or . . . is threatened with material injury." See 19 U.S.C. § 1673(2)(A)(i)–(ii); Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306 (Fed. Cir. 2017).   Dumping constitutes unfair competition because it permits foreign producers to undercut domestic companies by selling products below their fair market value.   Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012).   To address the harmful impact of such unfair competition, Congress enacted the Tariff Act of 1930, which empowers Commerce to investigate potential dumping and if necessary to issue orders instituting duties on subject merchandise.   Id. at 1047.   In these instances, "the amount of the [AD] duty is 'the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise.'"   Shandong Rongxin Imp. & Exp. Co. v. United States, 42 CIT __, __, 331 F. Supp. 3d 1390, 1394 (2018) (quoting 19 U.S.C. § 1673), aff'd, 779 F. App'x 744 (Fed. Cir. 2019).   If the exporting country is a non-market economy that provides insufficient information to determine the normal value, Commerce may use surrogate values from market economy countries for "the factors of production utilized in producing the merchandise and . . . for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1).   Upon request, Commerce may conduct an administrative review of its AD duty determination and recalculate the applicable rate.   Id. § 1675(a)(1)–(2); see Shandong Rongxin, 331 F. Supp. 3d at 1394.

In determining or reviewing whether a good is being sold in the United States at less than

fair value, Commerce may issue questionnaires to selected mandatory respondents[2] in order to

gather information.  See 19 U.S.C. § 1677f-1(c)(2)(A)–(B).   Where Commerce's request is

unambiguous and pertinent to an investigation or review, 19 U.S.C. § 1677m requires that a

respondent "prepare an accurate and complete record in response to questions plainly asked by

Commerce" in a timely fashion.  Tung Mung Dev. Co. v. United States, 25 CIT 752, 758, 23 ITDR

1775 (2001) (citing Olympic Adhesives, Inc. v. United States, 899 F.2d 1565, 1571–72 (Fed. Cir.

1990)).  If Commerce deems a response to its request deficient, then Commerce "shall promptly

inform the person submitting the response of the nature of the deficiency and shall, to the extent

practicable, provide that person with an opportunity to remedy or explain the deficiency in light of

the time limits established for the completion of investigations or reviews under this subtitle."  19

U.S.C. § 1677m(d).  Commerce may provide this notice and the opportunity to remedy deficiencies

through issuance of a supplemental questionnaire.  Commerce will verify information relied upon

in the final results of an administrative review if: (1) a domestic interested party timely requests

verification and no verification under the relevant paragraph occurred during either of the two

---

[2] In AD investigations or administrative reviews, Commerce may select mandatory respondents
pursuant to 19 U.S.C. § 1677f-1(c)(2), which provides:

> If it is not practicable to make individual weighted average dumping margin
> determinations under paragraph (1) because of the large number of exporters or
> producers involved in the investigation or review, the administering authority may
> determine the weighted average dumping margins for a reasonable number of
> exporters or producers by limiting its examination to--
>
>> (A) a sample of exporters, producers, or types of products that is
>> statistically valid based on the information available to the
>> administering authority at the time of selection, or
>> (B) exporters and producers accounting for the largest volume of the
>> subject merchandise from the exporting country that can be
>> reasonably examined.

immediately preceding administrative reviews, or (2) the Secretary of Commerce determines that "good cause" for verification exists.   See 19 U.S.C. § 1677m(i)(1)–(3); 19 C.F.R. § 351.307(b)(1)(iv)–(v).

### A.  Reliance on FA and AFA

Pursuant to 19 U.S.C. § 1677e, if a party fails to satisfactorily respond to Commerce's requests for "necessary information" to calculate a dumping margin by (1) withholding requested information, (2) failing to provide information by the submission deadlines or in the form or manner requested, (3) significantly impeding a proceeding, or (4) providing information that cannot be verified, Commerce shall use FA to calculate the margin.  Id. § 1677e(a)(1)–(2).  "The use of facts otherwise available . . . is only appropriate to fill gaps when Commerce must rely on other sources of information to complete the factual record."  Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1346 (Fed. Cir. 2011) (citing Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003)).

Furthermore, Commerce may make a separate determination that the respondent failed to cooperate "to the best of its ability" and apply AFA.  19 U.S.C. § 1677e(b)(1)(A).  A respondent does not cooperate to the "best of its ability" when it fails to "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries."  Nippon Steel, 337 F.3d at 1382.  The Federal Circuit in Nippon Steel explained that Commerce must make an objective and subjective determination regarding respondent's efforts in assessing whether it acted to the best of its ability.  Id. at 1382–83.  The Federal Circuit clarified that this test applies "regardless of motivation or intent" on the part of the respondent, and that it "does not condone inattentiveness, carelessness, or inadequate record keeping."  Id.

In applying AFA, Commerce may rely on information from the initial petition, a final determination in the investigation, a previous administrative review, or any other portion of the administrative record.  19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c).  Although Commerce may choose to supplement the administrative record of its own accord, the burden of creating an adequate record, and therefore of avoiding AFA, lies with the respondent.  Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1337 (Fed. Cir. 2016) (quoting QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).  "[W]here there is useable information of record but the record is incomplete," Commerce applies partial AFA.  Wash. Int'l Ins. v. United States, 33 CIT 1023, 1035 n.18, 31 ITRD 1803 (2009) (citing Yantai Timken Co. v. United States, 31 CIT 1741, 1746–48, 521 F. Supp. 2d 1356, 1364–65 (2007), aff'd, 300 Fed. Appx. 934 (Fed. Cir. 2008)).  However, Commerce applies total AFA when "none of the reported data is reliable or usable," Mukand, Ltd. v. United States, 767 F.3d 1300, 1305 (Fed. Cir. 2014), or where "the bulk of it is determined to be flawed and unverifiable" because of "pervasive and persistent deficiencies that cut across all aspects of the data."  Zhejiang DunAn Hetian Metal, 652 F.3d at 1348 (discussing Steel Authority of India, Ltd. v. United States, 25 CIT 482, 149 F. Supp. 2d 921 (2001)).  After making a finding that AFA is appropriate, Commerce may then select an AD rate using the adverse inferences against the respondent.  See 19 U.S.C. § 1677e(d).  The statute explicitly provides Commerce with the discretion to select among any dumping margins "under the applicable [AD] order," including "the highest such rate or margin."  Id. § 1677e(d)(1)(B)–(2).  In selecting an AFA rate, however, Commerce must "consider the totality of the circumstances in selecting an AFA rate, including, if relevant, the seriousness of the conduct of the uncooperative party."  BMW of N. Am. LLC v. United States, 926 F.3d 1291, 1302 (Fed. Cir. 2019).

## II.   Factual and Procedural History

### A.   Administrative Review of Sea-Line

Commerce issued an AD duty order on fresh garlic from China in 1994.  <u>AD Duty Order: Fresh Garlic From the People's Republic of China</u>, 59 Fed. Reg. 59,209 (Dep't Commerce Nov. 16, 1994).  In November of 2017, Commerce published a notice of opportunity to request an administrative review of this order for the period of review ("POR") for November 2016 through October 2017.  <u>Opportunity to Request Administrative Review</u>, 82 Fed. Reg. 50,620 (Dep't Commerce Nov. 1, 2017).  Sea-Line, Best Buy Produce International, Inc., and FGPA requested a review of Sea-Line.[3]  <u>See</u> Requests for Administrative Review, P.R. 6, 8, 10.  Commerce initiated an administrative review on January 11, 2018, selected Sea-Line as a mandatory respondent after the largest importers withdrew from the review, and issued it a questionnaire.  <u>Initiation of AD and Countervailing Duty Administrative Reviews</u>, 83 Fed. Reg. 1,329, 1331–32 (Dep't Commerce Jan. 11, 2018); Mem. from USDOC to Office Dir/EC Pertaining to Interested Parties Respondent Selection Memo (June 22, 2018), P.R. 155, C.R. 66; Letter from USDOC to Davis & Leiman Pertaining to Sea-Line Questionnaire (June 22, 2018), P.R. 156 ("Initial Questionnaire").

Sea-Line submitted answers in July and August of 2018.  Resp. from Davis & Leiman P.C. to Sec'y of Commerce Pertaining to Sea-Line Sec. A QR (July 18, 2018), P.R. 163–68, C.R. 68–83 ("Sea-Line's Sec. A Resp."); Fresh Garlic from PRC: Sec. C Resp. of Sea-Line (Aug. 10, 2018), P.R. 177, C.R. 85–87 ("Sea-Line's Sec. C Resp."); Resp. from Davis & Leiman P.C. to Sec'y of

---

[3] Sea-Line originally underwent a new shipper review in June 2009.  <u>Fresh Garlic From the People's Republic of China: Initiation of New Shipper Review</u>, 74 Fed. Reg. 31,241, 31,241–42 (Dep't Commerce June 30, 2009).  Sea-Line had no shipments until the 22nd POR covering 2015 through 2016, but was not individually examined for that POR.  <u>Fresh Garlic From the People's Republic of China: Final Results and Partial Rescission of the 22nd AD Duty Administrative Review and Final Result and Rescission, in Part, of the New Shipper Reviews; 2015–2016</u>, 83 Fed. Reg. 27,949, 27,951 (Dep't Commerce June 15, 2018).

Commerce Pertaining to Sea-Line Sec. D. QR (Aug. 20, 2018), P.R. 183, C.R. 91–93 ("Sea-Line's

Sec. D Resp."). Sea-Line reported [[            ]] kgs of imports of garlic during the POR, valued

at $[[              ]]. Sea-Line's Sec. A Resp. at Ex. A-1. Despite being the importer of record,

and thus being responsible for the cash deposits accompanying imports under an AD order, Sea-

Line reported shipments on [[                          ]], meaning that per

the shipping terms with its customers Sea-Line [[

                          ]]. Sea-Line's Sec. C Resp. at 6; Sea-Line's Sec. A Resp. at Ex. A-1.

Commerce initially requested Sea-Line report the date on which payment was received from the

customer for each of its U.S. sales and the gross unit price less price adjustments equal to net

amount of revenue for each sale. Initial Questionnaire at Sec. C. However, Sea-Line omitted the

payment date field from its U.S. sales database because it claimed an inability to match customer

payments to sale entries because payments were not made on a transaction-specific basis. Sea-

Line's Sec. C Resp. at 5–6. Sea-Line also reported the gross unit price for U.S. sales "in USD per

kilogram," corresponding to the price listed "on [its] commercial invoice[s]," rather than the

requested net revenue price. Id. at 9.

In October 2018, Commerce issued a supplemental questionnaire requesting additional

information on: (1) an aspect of its U.S. sales, specifically [[


]]; and (2) net revenue U.S. price data. Commerce's First Suppl. Questionnaire for Sea-Line

(Oct. 2, 2018), P.R. 194. In its response to Commerce's first supplemental inquiry, Sea-Line

explained that above the invoice price, its actual U.S. sales price was the "total negotiated price,"

which included two additional components: Price Component A, [[              ]], and Price

Component B, [[                ]]. Sea-Line's First Suppl. Resp. at 3, (Oct. 22, 2018), P.R.

203, C.R. 112–18.  Sea-Line also explained that its U.S. customers paid [[

]].  See id. at 3–4.  As substantiation, Sea-Line provided one

signed agreement that indicated that [[

]]. Id. at Ex. S-4.  Second, for its U.S. sales price information,

Sea-Line revised its sales database to include payment dates based on "records for sales and

receipts" and calculations of accumulated sales values and accumulated payment values for each

customer.  Id. at 10, Ex. S-14.  At the time the revised database was submitted, Sea-Line reported

that had it been paid for [[                                    ]] of its total number of U.S. sales, accounting for

roughly [[                    ]] its total sales value, and reported [[

]].  Id. at Ex. S-14 (listing to be collected payments).  As to Commerce's second request, Sea-Line

did not revise its previously provided gross unit price to accommodate Commerce's request for

net revenue price.  Compare Sea-Line's Sec. C Resp. at Ex. C-1 with Sea-Line's First Suppl. Resp.

at Ex. S-14.

The following month, Commerce issued Sea-Line a second supplemental questionnaire

again addressing the previously identified discrepancies and requested further supporting

documentation.  Second Suppl. Questionnaire for Sea-Line (Nov. 14, 2018), P.R. 228, C.R. 126.

Sea-Line submitted its narrative responses to this second supplemental questionnaire on November

19, 2018, and additional supporting documentation on December 4, 2018.  Sea-Line's Resp. to

Commerce's Second Suppl. Questionnaire (Nov. 19, 2018), P.R. 233, C.R. 128 ("Sea-Line's

Second Suppl. Resp. Pt. 1"); Sea-Line's Resp. to Commerce's Second Suppl. Questionnaire,

Question 3 (Dec. 4, 2018), P.R. 243, C.R. 133–38 ("Sea-Line's Second Suppl. Resp. Pt. 2").  Sea-

Line again claimed to "negotiate[] a total final price with U.S. customers" that included Price

Component A, which [[                                                                                    ]], and Price

Component B.  Sea-line's Second Suppl. Resp. Pt. 1 at 2.  Initially Sea-Line claimed Commerce's

requested supporting documentation "is entirely outside Sea-Line's possession or knowledge."  Id.

Yet, in its December supporting submission it provided [[                                ]] for [[

                                                         ]].  Sea-Line's

Second Suppl. Resp. Pt. 2 at 1.

### B.  Results of Commerce's Review

On November 30, 2018, Commerce issued preliminary results in which it calculated an

estimated weighted-average dumping margin of $4.60 per kilogram for Sea-Line based on Sea-

Line's reported U.S. sales data.  Fresh Garlic From the People's Republic of China: Preliminary

Results of Antidumping Duty Administrative Review; 2016–2017, 83 Fed. Reg. 63,479, 63,481

(Dep't Commerce Dec. 10, 2018) ("Preliminary Results"); Decision Mem. for the Prelim. Results

and Final Rescission, in part, of the 2016–2017 AD Duty Administrative Review: Fresh Garlic

from the People's Republic of China (Nov. 30, 2018), P.R. 242 ("PDM").  Because Sea-Line had

just provided its narrative responses and had not yet provided supporting documentation for its

response to the second supplemental questionnaire by the publication of the Preliminary Results,

Commerce noted that "these responses will not be analyzed for the preliminary results."  PDM at

4.  Commerce calculated a dumping margin based on Sea-Line's reported U.S. prices and used [[

                                    ]] as the payment date [[

                    ]].  Calculation Mem. For the People's Republic of China: Calculation Mem.

for the Prelim. Results of Sea-Line at 7–8 (Dec. 10, 2018), P.R. 248, C.R. 146.  In its Preliminary

Results, Commerce announced its plans to conduct verification based on FGPA's request.  See 83

Fed. Reg. at 63,480.  FGPA did not request and Commerce did not announce verification of Sea-

Line specifically.  See id.; Petitioner's Request for Verification (Apr. 24, 2018), P.R. 112.  On

February 14, 2019, FGPA withdrew its request, and Commerce subsequently cancelled verification.  See Petitioner's Withdrawal of Verification Request (Feb. 14, 2019), P.R. 258; 23rd Administrative Review of Fresh Garlic from the People's Republic of China -- Briefing Schedule at 1 (Feb. 15, 2019), P.R. 259.   The parties do not dispute that Sea-Line had not previously requested verification nor did it respond to the withdrawal and cancellation of verification with its own request.  See Pl.'s Resps. to the Ct.'s Questions for Oral Arg. at 15, Nov. 9, 2020, ECF No. 39 ("Pl.'s. Suppl. Br."); Def.'s Br. at 23; Def.-Inter.'s Br. at 22.

After analyzing the data provided by Sea-Line just before and right after publication of the Preliminary Results and receiving case and rebuttal briefs from interested parties, Commerce published the Final Results in July 2019.  Based on its analysis of those supplemental responses, Commerce determined that it could not rely on Sea-Line's reported U.S. prices because of "inconsistent and irreconcilable information," and failure to "consistently report and substantiate the amount that Sea-Line charged to and received from its U.S. customers for U.S. sales."  Final Analysis Memo at 7.  Commerce also rejected Sea-Line's case brief request that Commerce use its reported total negotiated price as the U.S. price for the dumping calculation.  Id. at 11–13. Commerce, thus, assigned a dumping margin based on total AFA of $4.71 per kilogram for failure to cooperate to the best of its ability despite opportunities to remedy deficiencies in its responses. See Final Results, 84 Fed. Reg. at 35,603; IDM at 5–6, 10–12.

### C.  Procedural History

Sea-Line initiated this litigation on August 21, 2019.  Summons, Aug. 21, 2019, ECF No. 1; Compl., Sept. 9, 2019, ECF No. 7.  FGPA joined the litigation as Defendant-Intervenor on October 3, 2019.  Order Granting Mot. to Intervene as Def.-Inter., ECF No. 18.  On February 18, 2020, Sea-Line filed a revised Rule 56.2 motion for judgment on the agency record, arguing that

Commerce erred in applying AFA and erred in its selection of a surrogate country.  Pl.'s Br. at 1.

The Government and FGPA then responded to Sea-Line's motion in May of 2020.  Def.'s Br.;

Def.-Inter.'s Br.  Plaintiff replied on June 30, 2020.  Reply Br. of Pl. Qingdao Sea-Line Int'l Trade

Co., Ltd., ECF No. 32 ("Pl.'s Reply").  Oral argument was held on November 12, 2020.  Oral Arg.,

ECF No. 46.  Prior to oral argument, the court issued and the parties responded to questions

regarding the case.  Letter re: Questions for Oral Arg., Oct. 28, 2020, ECF No. 38; Pl.'s Suppl.

Br.; Def.'s Resp. to the Ct.'s Questions, Nov. 9, 2020, ECF No. 41 ("Def.'s Suppl. Br."); Def.-

Inter.'s Resp. to the Ct.'s Questions for Oral Arg., Nov. 10, 2020, ECF No. 44 ("Def.-Inter.'s

Suppl. Br.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2).  The standard of review in this action is set forth in 19 U.S.C. § 1516a(b)(l)(B)(i):

"[t]he court shall hold unlawful any determination, finding or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law."

## DISCUSSION

Sea-Line challenges Commerce's application of AFA and its selection of a surrogate

country in the <u>Final Results</u>.  The court first concludes that Commerce correctly identified a gap

in the record and used FA to calculate its dumping margin.  Second, the court concludes that

Commerce permissibly applied AFA because Sea-Line failed to cooperate to the best of its ability.

Given that it affirms Commerce's application of AFA, the court does not address Sea-Line's

challenge to Commerce's selection of a surrogate country because Commerce relied on total AFA and not surrogate information to calculate Sea-Line's dumping margin.[4]  See IDM at 10–12.

### I.      *Commerce Correctly Resorted to FA.*

In its AD review of Sea-Line, Commerce resorted to FA rather than relying on Sea-Line's responses regarding its U.S. sales price.  IDM at 5.  Commerce identified gaps and inconsistencies in the record stemming from "Sea-Line's fail[ure] to consistently report and substantiate the amount that Sea-Line charged to and received from its U.S. customers for its U.S. sales during the POR."  Id.  Specifically, Commerce noted: (1) Sea-Line did not provide payment dates as requested, id. at 10; (2) Sea-Line's reported U.S. sales price "was not supported by its sales reconciliation or financial statements" despite having three opportunities to provide such information, id. at 11; and (3) Sea-Line inconsistently characterized its U.S. price as invoice price and total negotiated price, id.  Thus, Commerce concluded "that reliable information concerning

---

[4] In its Complaint and opening brief, Sea-Line contends that Commerce's selection of Romania rather than Mexico as the primary surrogate country was not supported by substantial evidence or in accordance with law.  Compl. ¶¶ 16–17; Pl.'s Br. at 27–30.  But, as the Government correctly observes, "although Commerce relied on surrogate value data to calculate a weighted average dumping margin for one mandatory respondent . . . , Commerce did not calculate a dumping margin based on surrogate value data for Sea-Line. . . . Commerce . . . determine[d], in the Final Results, that Sea-Line qualified for a separate rate, [but] Commerce applied total [AFA] in determining Sea-Line's dumping margin."  Def.'s Suppl. Br. at 17 (citing IDM at 6).  The court thus concludes that Sea-Line has not been impacted by Commerce's surrogate country selection, and as such lacks standing to challenge that decision.  See Massachusetts v. EPA, 549 U.S. 497, 517 (2007) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61, 572 (1992)) (holding that, in order to confer jurisdiction, a plaintiff must show "that it has suffered a concrete and particularized injury that is either actual or imminent," (2) "that the injury is fairly traceable to the defendant," and (3) "that a favorable decision will likely redress that injury"); see also Def.-Inter.'s Br. at 23–25 (arguing that Sea-Line's challenge to surrogate value selection is not ripe for adjudication because none of the separate rate respondents appealed the Final Results).  Furthermore, Sea-Line acknowledges this by requesting that "if the [c]ourt remands the Final Results back to Commerce on the ground that Commerce erred in its decision regarding AFA and denying it a calculated rate, th[en] the [c]ourt also consider Sea-Line's arguments with regard to Romanian surrogate value data."  Pl.'s Suppl. Br. at 19 (citing Asahi Seiko Co. v. United States, 33 CIT 1693, 1697 (2009)).

the amount that Sea-Line charged to and received from its U.S. customers, for its sales to the United States during the POR, is not present on the record." Id. at 11.  Because Commerce concluded that the gaps and inconsistencies in the record were "core to Commerce's ability to calculate Sea-Line's dumping margin" and Sea-Line's submissions could not "serve as a reliable basis for [the] dumping margin analysis," Commerce resorted to FA to calculate Sea-Line's estimated weighted dumping margin.  Id. at 5.

Sea-Line contends that there was no gap in the record, arguing that any deficiency in its responses was the result of Commerce not properly notifying and providing Sea-Line an opportunity to remedy.  Pl.'s Br. at 18–21; Pl.'s Reply at 3.  First, Sea-Line argues that the presence of [[                    ]] in its data does not constitute a gap in the record and that Commerce could have used other information on the record to calculate its dumping margin as it did in the Preliminary Results.  Pl.'s Br. at 18–19; Pl.'s Reply at 13.  Second, Sea-Line argues that Commerce erred in not issuing deficiency questionnaires to allow Sea-Line to resubmit illegible documents in accordance with 19 U.S.C. § 1677m(d).  Pl.'s Br. at 21–23.  Third, Sea-Line argues that Commerce's cancellation of verification was unlawful because "it would have addressed minor issues Commerce cited in the Final Results."  Id. at 24.

The Government and FGPA respond that Commerce acted based on substantial evidence and otherwise in accordance with law by (1) determining Sea-Line's initial questionnaire responses raised significant questions about the reliability of its reported U.S. prices (2) issuing supplemental questionnaires; and (3) determining Sea-Line's first and second supplemental questionnaire responses indicated its initially reported U.S. sales prices were deficient and that subsequently provided information did not correct these deficiencies.  Def.'s Br. at 13–22; see Def.-Inter.'s Br. at 17–19.  The Government also contends that Commerce was not required to

allow Sea-Line to resubmit illegible documents because its issuance of two supplemental questionnaires regarding Sea-Line's U.S. price information fulfilled Commerce's obligation to notify and allow correction of deficiencies in questionnaire responses.  Def.'s Br. at 16, 20–22. Similarly, FGPA notes that Commerce "assigned Sea-Line a rate based on total AFA because the exporter failed to submit accurate and reliable U.S. prices, and not because Sea-Line submitted illegible copies of certain tangentially-related documents."  Def.-Inter.'s Final Comments at 2, Nov. 20, 2020, ECF No. 51.  Finally, the Government and FGPA counter that Commerce is not obliged to verify a respondent's submission when necessary information is missing from the record and where no request for verification was on the record, as was the case here.  Def.'s Br. at 23–25; Def.'s Suppl. Br. at 16; Def.-Inter.'s Br. at 20.

### A.  Gaps and Inconsistencies in Sea-Line's U.S. Sales Price Data

Based on Sea-Line's questionnaire response and subsequent supplemental questionnaire responses, Commerce concluded that Sea-Line "failed to consistently report and substantiate the amount that Sea-Line charged to and received from its U.S. customers for its U.S. sales during the POR."  IDM at 10.  This was because Commerce could not reconcile Sea-Line's U.S. sales database with source documentation despite issuing two supplemental questionnaires to Sea-Line for that purpose.  Id. at 10–11.  In its original questionnaire response, Sea-Line failed to provide dates of payments received from U.S. customers.  See Sea-Line's Sec. C Resp. at 5–6.  Customers' payments as to each sale, Sea-Line claimed, were not ascertainable because they were not paid on a transaction-specific basis.  See id.  Rather, Sea-Line suggested Commerce assign each sale a payment date based on the terms of payment, which Sea-Line reported as [[

]].  Sea-Line's Sec. C Resp. at 6–7.  Sea-Line also reported the

gross unit price for U.S. sales corresponding to the price listed "on [its] commercial invoice[s]" despite Commerce's request for prices to be listed as net revenue price.  Id. at 9.

Commerce noted that after first reporting its U.S. sales price as invoice price in its original questionnaire response, Sea-Line later explained that above the invoice price, its actual U.S. sales price was the total negotiated price, which included two additional components above its invoice price: Price Component A and Price Component B.  Final Analysis Memo at 9.  To support this narrative explanation, Sea-line submitted a customer agreement, but Commerce found it to be ambiguous as to which party actually assumed the cost of the additional price components.  Id. at 9–10.  Furthermore, Sea-Line continued to report its U.S. price as invoice price in its U.S. sales database even after it explained that its actual U.S. sales price was different than the invoice price.  Id. at 10.  After Commerce sought further clarification on this point and asked Sea-Line for a reconciliation breaking out the additional components, Sea-Line provided documentation with its second supplemental questionnaire response that again did not break out these components or reconcile Sea-line's reported U.S. sales prices.  Id.  Further, Commerce identified a large quantity of payment term violations by Sea-Line's customers related to [[

]], provided multiple instances of legible invoices not matching Sea-Line's bank documentation, and noted other discrepancies regarding the supporting documentation for Price Component A.  Id. at 8–10.  Thus, Commerce noted that Sea-Line did not provide information related to Price Component A or a reconciliation of U.S. price with this component, and, because of the identified discrepancies in supporting documents, Commerce could not calculate the U.S. sales price based on the information in the record.  Id. at 12.  Finally, Commerce noted that, even assuming the data could be used to calculate U.S. sales price as Sea-Line proposed, it would have the undue burden of conducting "more than [          ]] individual calculations," requiring "a logical leap over the

factual gaps in the record" because the composition of Price Component A did not "align with the actual payment data reported." Id. at 11–12. Commerce determined that the inconsistencies and irreconcilable submissions detailed above constituted withheld information and impediments to the proceedings within 19 U.S.C. § 1677e(a)(2)(A), (C) and resorted to filling this gap in the record with FA. Id. at 12–13.

Given the many inconsistencies identified by Commerce in Sea-Line's reported U.S. sales price data, the court rejects Sea-Line's argument that Commerce erred in resorting to FA. Commerce provided Sea-Line three opportunities to provide consistent, reconcilable, and useable U.S. sales price data and Sea-Line did not do so.[5] Commerce properly disregarded Sea-Line's responses regarding its U.S. sales price because the information was not verifiable, reliable, or usable without undue difficulty in accordance with 19 U.S.C. § 1677m(e). Thus, Commerce properly identified a gap in the record regarding Sea-Line's U.S. sales price information and resorted to FA in order to complete its review of Sea-Line's dumping margin. See 19 U.S.C. § 1677e(a)(2).

Sea-Line mischaracterizes Commerce's determination by finding fault with discrete aspects of Commerce's conclusions about its U.S. sales price while not addressing the main underlying problem that Commerce consistently identified: the lack of complete and supported U.S. sales price data. Commerce's conclusion was not just that certain aspects of Sea-Line's U.S. sales price information was deficient, but that Sea-Line's narrative responses contradicted

---

[5] Sea-Line also contends that Commerce deviated from its practice of using the factual cut-off date as the payment date for [[                    ]] by not using that neutral information to fill in this gap in the record here. Pl.'s Br. at 19; Pl.'s Suppl. Br. at 8. However, because the payment date was one of several gaps and inconsistencies in the record that Commerce could not have rectified by using the factual cut-off date as the payment date alone, the court concludes that Commerce did not deviate from its practice here, but rather rejected unreliable information provided by Sea-Line.

themselves and that Sea-Line's supporting documentation further did not support Sea-Line's narrative responses.  See Final Analysis Memo at 9–12.  Once it provided Sea-Line two opportunities to clarify its U.S. sales price and Sea-Line failed to do so, Commerce met its requirement to "promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency."  19 U.S.C. § 1677m(d).  Commerce had no further obligation to notify Sea-Line of specific deficiencies regarding Sea-Line's documentation that would not have cured Commerce's determination that the U.S. sales price data as a whole was unreliable.  None of the cases cited by Sea-Line detract from this conclusion.  See, e.g., Pl.'s Br. at 20–21 (citing Hyundai Steel Co. v. United States, 42 CIT __, __, 282 F. Supp. 3d 1332, 1343–44 (2018); Ta Chen Stainless Steel Pipe v. United States, 23 CIT 804, 21 ITRD 2057 (1999); China Kingdom Imp. & Exp. Co. v. United States, 31 CIT 1329, 1346–47, 507 F. Supp. 2d 1337, 1353–54 (2007)).

       For the same reason, Sea-Line's contention that it proposed a feasible method of calculation of its U.S. sales price, Pl.'s Br. at 24–25, ignores the errors cited by Commerce that inform Commerce's conclusion that the information was untrustworthy as a whole that constituted a gap in the record pursuant to 19 U.S.C. § 1677e.  Sea-Line's first and second supplemental questionnaire responses did not resolve significant questions raised by the initial questionnaire responses.  IDM at 10.  Rather, than identifying unrelated deficiencies within Sea-Line's questionnaire responses, data, and supporting documentation, Commerce cited issues throughout Sea-Line's responses that undermined the integrity and reliability of Sea-Line's reported U.S. sales price data as a whole -- information core to its Final Results.  See IDM at 5.  Commerce permissibly concluded that it would not have been able to use the data to calculate U.S. sales price and that

Sea-Line's proposed method of calculation was independently irreconcilable with the information

on the record.  See Final Analysis Memo at 11–12.

In sum, Commerce acted in accordance with 19 U.S.C. § 1677e(a) and § 1677m(e), in

disregarding Sea-Line's reported U.S. sales information.

### B.  Illegible Documents

In explaining why it could not rely upon Sea-Line's reported U.S. sales price information,

Commerce, among the many reasons discussed above, observed that

> the poor quality of certain scanned documents resulted in bank documentation that
> was illegible for use in reconciling the payment dates, bank account numbers,
> charges or payments to the U.S. sales database.  For certain invoices, the words and
> numbers on the bank documents submitted to support these data are too blurry to
> discern, and thus, both the payment amount and dates are unverifiable.

IDM at 10; Final Analysis Memo at 9.

The court rejects Sea-Line's contention that Commerce's Final Results are undermined by

its failure to allow Sea-Line to resubmit the illegible documentation.  See Pl.'s Br. at 21–23.  As

explained above, Sea-Line misapprehends the totality of the circumstances under which

Commerce made its conclusion.   Sea-Line is correct that 19 U.S.C. § 1677m(d) requires

Commerce to notify a party of "the nature of the deficiency and shall, to the extent practicable,

provide that person with an opportunity to remedy or explain the deficiency in light of the time

limits established for the completion of investigations or reviews."   However, the illegible

documents were only one of several reasons that Commerce concluded Sea-Line's reported data

was deficient.  See Final Analysis Memo at 8–12.  Beyond certain illegible supporting documents,

Sea-Line's own explanations and other legible documentation provided reason for Commerce to

believe that the invoice price listed did not equal Sea-Line's U.S. price.  See, e.g., Final Analysis

Memo at 10–11.  Resubmitting the illegible documents would not rectify that deficiency.  As the

Government explains, "no part of the law states that Commerce must itemize, with detailed particularity, each specific deficiency within a broader set of data relating to a specific inquiry." Def.'s Post-Arg. Submission at 2, Nov. 19, 2020, ECF No. 47.  Rather, Commerce alerted Sea-Line to its deficient U.S. price information and allowed Sea-Line two opportunities to remedy.  No further opportunities to remedy were required, including opportunities to provide legible versions of the illegible supporting documents.

Sea-Line relies upon several other decisions of the court to argue that Commerce is required to allow parties to resubmit legible versions of illegible documents.  Pl.'s Br. at 23 (citing Ereğli Demir ve Çelik Fabrikalari T.A.Ş. v. United States, 42 CIT __, __, 308 F. Supp. 3d 1297, 1318 (2018) ("Ereğli Demir") (finding error in Commerce's decision to reject certain illegible documents); Shandong Jinxiang Zhengyang Imp. & Exp. Co. v. United States, 44 CIT __, __, 429 F. Supp. 3d 1373, 1380 (2020) (concluding that Commerce did not err in rejecting a case brief where a party failed to correct illegible portions); SeAH Steel Vina Corp. v. United States, 42 CIT __, __, 332 F. Supp. 3d 1314, 1324–25 (2018) (concluding that a party waived its argument regarding illegible documents)).  Of these cases, only Ereğli Demir, in which the court concluded that Commerce erred in rejecting certain illegible and partially untranslated documents provided through a supplemental questionnaire response, is arguably analogous.  See 308 F. Supp. 3d at 1317–18.  The court noted that "based on the particular facts of this case in which only one or two pages of a multi-page exhibit were difficult to read and a substantial portion of each document was translated," id. at 1318 n.28, and Commerce did not seek any additional information related to this topic until the issuance of a third supplemental questionnaire, "Commerce erred in failing to inform [respondent] that its supplemental submission was deficient or make findings with regard to the practicability of providing [respondent] with an opportunity to remedy or explain the deficiencies."

Id. at 1318.   Further, the court rejected Commerce's reasoning because "[n]owhere [did] Commerce explain the materiality of these discrepancies" to Commerce's stated purpose for the documentation.  Id. at 1319.  In sum, the court concluded that Commerce's reasons, "individually and together, fail[ed] to support [its] determination." Id. at 1319.  The court cannot reach the same conclusion regarding Sea-Line's illegible documentation.   Here, Commerce explained that the information it sought was core to its analysis, Commerce sought information related to U.S. sales price through each supplemental questionnaire, and yet Sea-Line never provided reconcilable information to Commerce on its U.S. sales price.  See IDM at 5; Final Analysis Memo at 10.  Quite unlike the fact bound conclusion in Ereğli Demir, Commerce's rejection of Sea-Line's information was supported based on individual reasons and as a whole, and Commerce explained why its overarching conclusion that the data was unusable was material to its entire investigation.   The court is unpersuaded by this challenge to Commerce's Final Results.

### C.  Cancellation of Verification

After issuance of the Preliminary Results, FGPA withdrew its request for verification and Commerce cancelled verification.  See Petitioner's Withdrawal of Verification Request (Feb. 14, 2019), P.R. 258; 23rd Administrative Review of Fresh Garlic from the People's Republic of China -- Briefing Schedule at 1 (Feb. 15, 2019), P.R. 259.  Sea-Line did not request verification or object to Commerce's cancellation in its subsequent briefs.  See Pl.'s Suppl. Br. at 15; Def.'s Br. at 23; Def.-Inter.'s Br. at 22.   Nevertheless, Sea-Line now argues that Commerce erred in cancelling verification because it would have allowed Sea-Line "to address[] minor issues Commerce cited in the Final Results." Pl.'s Br. at 24.

The court is not persuaded by this argument.  Commerce has discretion to "decide whether and how to verify the information submitted during an [AD] proceeding." Carpenter Tech. Corp.

v. United States, 33 CIT 1721, 1732–33, 662 F. Supp. 2d 1337, 1346 (2009).  Commerce did not

err in refusing to verify Sea-Line's submissions because, as discussed above, Commerce identified

a pattern of missing and inconsistent information that did not reconcile with the reported pricing

methodology in Sea-Line's submitted material.  As a result, once FGPA withdrew its request for

verification, none of the reasons for conducting verification per the applicable statute or regulation

were present.  See 19 U.S.C. § 1677m(i)(1)-(3); 19 C.F.R. § 351.307(b)(1)(iv)–(v).  Sea-line never

requested verification and never put forward arguments that good cause existed for Commerce to

conduct verification.  Sea-Line cites Timken U.S. Corp. v. United States, 434 F.3d 1345, 1354

(Fed. Cir. 2006), to argue that Commerce erred in rejecting verifiable information by cancelling

verification.  Pl.'s Br. at 27.  However, the Federal Circuit in Timken mentioned Commerce's

verification procedures only in dicta in relation to a fact-bound argument on appeal.  See 434 F.3d

at 1354 ("If Commerce had reason to doubt Timken's corrective information, then it could have,

and perhaps should have, performed a second verification.").

        Furthermore, the Federal Circuit rejected Sea-Line's exact argument regarding verification

in Shakeproof Assembly Components v. United States, 268 F.3d 1376 (Fed. Cir. 2001).  There,

the Court noted that verification procedures are reviewed for an abuse of discretion, and "[i]n all

cases . . . verification must be timely requested by an interested party."  Id. at 1383.  Plaintiff

Shakeproof had not requested verification, but rather argued that "it did not have a reasonable

opportunity to request verification because it was unaware that Commerce would use [certain

record information in its calculation]."  Id. at 1383.  Thus, the Court concluded that Shakeproof

could not argue on appeal that "information should have been verified when it failed to timely

request verification as required by statute" and that "Commerce did not abuse its discretion by

determining that there was not 'good cause' for further verification."  Id. at 1383–84 (citing Micron

<u>Tech., Inc. v. United States</u>, 117 F.3d 1386, 1396 (Fed. Cir. 1997)).  Therefore, the court similarly

rejects Sea-Line's contention that it "did not have an affirmative duty to request a verification,

after [FGPA] withdrew its request for verification, because at that time, Sea-Line was unaware

that Commerce was going to reject its entire questionnaire response and apply AFA."  Pl.'s Suppl.

Br. at 15.  Sea-Line made no argument to Commerce that good cause existed to conduct

verification, and Commerce did not abuse its discretion in determining that good cause did not

exist after FGPA withdrew its request.

In short, the court is also unpersuaded by this attempt to assign error in Commerce's AD

review.[6]  The court instead concludes that Commerce properly identified a gap in the record and

resorted to FA to calculate Sea-Line's dumping margin in this review.

## II.     *Commerce Did Not Err When Assigning Sea-Line A Dumping Margin Based On AFA.*

Beyond using FA, Commerce further determined that Sea-Line failed to cooperate to the

best of its ability pursuant to 19 U.S.C. § 1677e(b) by not providing a reliable U.S. sales price

despite being provided multiple supplemental questionnaires in which it could have remedied this

deficiency.  IDM at 6; Final Analysis Memo at 13.  Thus, Commerce applied AFA to Sea-Line's

dumping margin.

Sea-Line argues that Commerce acted without substantial evidence and contrary to law by

applying AFA because Commerce did not meet its obligation under 19 U.S.C. § 1677m(d) to notify

it of deficiencies in its responses for the reasons discussed and rejected above.  Pl.'s Br. at 17–23.

---

[6] While the Government characterizes Sea-Line's failure to request verification as a failure to exhaust administrative remedies, Def.'s Br. at 22–23, the court does not find this framing applicable.  The court instead follows the Federal Circuit's lead in <u>Shakeproof Assembly Components</u> in not using the exhaustion framework in describing Commerce's discretion to refuse to conduct verification.  <u>See</u> 268 F.3d 1376.  The court notes that, in this case, the outcome is the same regardless of the framework applied.

The Government and FGPA contend that Commerce lawfully relied on AFA in calculating and assigning a dumping margin for Sea-Line because its inconsistent and unreliable responses indicate that it did not do the maximum it was able to in complying with Commerce's requests. Def.'s Br. at 8–14, 16; Def.-Inter.'s Br. at 17–19.

While "[c]ompliance with the 'best of its ability' standard . . . 'does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.'" Dongtai Peak Honey Indus. Co. v. United States, 777 F.3d 1343, 1355 (Fed. Cir. 2015) (quoting Nippon Steel, 337 F.3d at 1382). The Federal Circuit in Nippon Steel held that that by failing to exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation," a respondent fails to act to the best of its ability. 337 F.3d at 1382. Respondents are expected to "take reasonable steps to keep and maintain full and complete records" in anticipation of possible production requests, and to "conduct prompt, careful, and comprehensive investigations of all relevant records" upon receiving an inquiry from Commerce. See id. at 1382.

The Federal Circuit's decision in Mukand, Ltd., 767 F.3d 1300, is instructive. There, the Federal Circuit upheld an application of AFA to a respondent that repeatedly failed to provide necessary information, did not explain its failure, and did not provide supporting documentation regarding its available information. Id. at 1304. Commerce described the requested product-specific cost information as "a fundamental element in the dumping analysis, and [] is standard procedure for Commerce to request" in AD investigations, and "Mukand evaded providing a direct response to Commerce's specific questions." Id. at 1307. Further, in describing Mukand's submission to Commerce, the Federal Circuit noted that Commerce "found that Mukand's failure to provide size-specific cost information rendered its response 'so incomplete that it could not

serve as a reliable basis for reaching a final determination' and could not be used without undue difficulty." Id. at 1304.  The Federal Circuit also noted that "it was not until Mukand responded to the third supplemental questionnaire that it informed Commerce that it did not maintain" the requisite information, but then "was suddenly able to provide the requested information after Commerce published the preliminary results and applied [AFA]," which the court noted "further demonstrated its failure to cooperate to the best of its ability." Id. at 1307.  The Federal Circuit concluded that "Commerce's decision to resorts to facts otherwise available and apply an adverse inference against Mukand [was] supported by substantial evidence." Id. at 1306.

Like the respondent in Mukand, Sea-Line did not act to the best of its ability and Commerce did not err in applying AFA to its calculation of Sea-Line's dumping margin.  As the information at issue in Mukand, U.S. sales price is "a fundamental element in the dumping analysis," and it was reasonable for Sea-Line to maintain such information. See 767 F.3d at 1307.  Commerce also found the information to be unreliable and, even assuming that it was usable, could not be used without undue difficulty. See id. at 1304.  Further, Sea-Line's revelation in its first supplemental questionnaire response that its U.S. sales price was more than the initial invoice price provided and Sea-Line's subsequent failure to provide complete information regarding the additional price components shows that Sea-Line at least was inattentive or careless in responding to Commerce's questionnaires, thus justifying the application of AFA. See id. at 1307; Dongtai Peak Honey Indus. Co., 777 F.3d at 1355.  Therefore, Commerce correctly determined that Sea-Line did not act to the best of its ability in the administrative review and appropriately applied AFA.

## CONCLUSION

The court concludes that Commerce's Final Results were in accordance with law and supported by substantial evidence.  Commerce identified a gap in the record in accordance with

Court No. 19-00145                                                              Page 26
**PUBLIC VERSION**

19 U.S.C. § 1677m and substantial evidence and permissibly applied AFA in calculating an AD

margin for Sea-Line.  Accordingly, Plaintiffs' motion for judgment on the agency record is denied;

Commerce's <u>Final Results</u> are sustained, and judgment is entered in favor of the United States.

> <u>**SO ORDERED.**</u>

<u>*/s/   Gary S. Katzmann*</u>
Gary S. Katzmann, Judge

Dated: <u>April 16, 2021</u>
          New York, New York